**MAGNOLIA 8 PROPERTIES, LLC, Respondent,**

v.

**CITY OF MAPLE PLAIN, Appellant.**

A16-1199

Court of Appeals of Minnesota.

Filed April 17, 2017

Lucas J. Thompson, Jux Law Firm, Minneapolis, Minnesota (for respondent).

Jason J. Kuboushek, Iverson Reuvers Condon, Bloomington, Minnesota (for appellant).

Considered and decided by Halbrooks, Presiding Judge; Worke, Judge; and Jesson, Judge.

## OPINION

HALBROOKS, Judge

Appellant challenges the district court's denial of its summary-judgment motion, arguing that it is entitled to statutory immunity on all claims. Because respondent challenges two separate instances of governmental conduct and we conclude that only one entitles appellant to statutory immunity, we affirm in part, reverse in part, and remand.

## FACTS

Respondent Magnolia 8 Properties, LLC (Magnolia), owns a building that contains commercial and residential space on the corner of Main Street and Budd Avenue in appellant City of Maple Plain. In January 2011, a leak from the city's water main beneath Main Street caused substantial flooding in the basement of Magnolia's building that necessitated replacement of four furnaces and a water softener. The city repaired the water-main leak.

Also in 2011, the city evaluated its street and infrastructure status by reviewing historical construction records, the current condition of the street or infrastructure, and the estimated cost of reconstruction. Based on this information, the city ranked and prioritized projects and estimated when each would be completed. One project included replacement of the water main and sewer infrastructure on Main Street adjacent to Magnolia's building, which the city scheduled to be done in 2014.

A memorandum from the city administrator to the mayor and city council summarized the evaluation, stating that determining an appropriate "reconstruction schedule is dependent on [the city's] funding and potential identification of new revenue sources" and that the city's "ability to complete projects may be hampered by the availability of infrastructure-dedicated funding." The city did not have infrastructure-dedicated funding in its budget to cover the costs of reconstructing its water main. Consequently, the city adopted a maintenance policy to "promptly respond to leaks and conduct repairs as soon as possible" on the water main beneath Main Street until the reconstruction project could be completed.

In 2012, the city applied for, and received, a grant to fund a downtown redevelopment project that was intended to attract private investors to help revitalize its downtown area and included "modification of water main and sewer lines under Main Street" near Magnolia's building. The city anticipated that the project would be completed by December 31, 2014, although the grant only required that the project commence no later than December 31, 2015. Despite receiving the grant, the city did not proceed with reconstruction of the water main under Main Street because it had not identified a developer for the project.

Unrelated to its downtown redevelopment project, the city began repairs on the sewer system under Budd Avenue near Magnolia's building in August 2014. During the sewer reconstruction and repairs, there was another water-main leak near Magnolia's building on September 11, 2014. The city stated that "jarring from the construction caused" the leak. The city discovered and immediately repaired the leak before it caused any damage but did not assess the soil condition or the risk of future damage to the water-main system near Magnolia's building.

On January 7, 2015, the city was notified of another water leak near Magnolia's building. Three hours after notification, it determined that a crack in the water main under Main Street was the cause. The city immediately secured the leak and repaired it the following day. But that water leak resulted in substantial damage to Magnolia's building, flooding the basement and causing the east foundation wall to partially collapse. The sidewalk adjacent to Magnolia's building also collapsed. By January 26, 2015, the city still had not identified a developer for the downtown redevelopment project.

Magnolia sued the city, seeking compensatory and punitive damages for nuisance, trespass, strict liability, and negligence associated with damage caused by the January 2015 water leak. The city moved for summary judgment, arguing that (1) it is entitled to statutory immunity; (2) there are no genuine issues of material fact with respect to Magnolia's claims of statutory trespass, common-law trespass, or nuisance, and that it is entitled to judgment as a matter of law; and (3) Magnolia's negligence claims are not actionable under the public-duty doctrine.

The city supported its motion with an affidavit from the city administrator, along with several exhibits. In the affidavit, the city administrator stated:

In determining whether or not to conduct the reconstruction of the pavement on and infrastructure under Main Street between Delano and Budd Avenues, the City considered the cost of the project and the needs of the surrounding businesses. The City's budget does not allow the City to pay for the reconstruction costs by itself; thus the City needed the assistance of the Livable Communities Grant to pay for the infrastructure. Additionally, the City has not moved forward with the pavement and infrastructure reconstruction because it did not have a Developer or Development Plan in place for the Downtown Redevelopment project. The City did not want to install new pavement or infrastructure until it knew what the needs of the Downtown Redevelopment project were. If the City put in the wrong size or type of infrastructure prior to the development, it might have had to be removed. The City could not afford these additional costs.

The exhibits attached to the affidavit included a 2011 spreadsheet and memorandum evaluating the city's street and

infrastructure status; the city's grant application for funding the downtown redevelopment project, which included a resolution identifying the need for grant funding; and minutes from the city's January 26, 2015 city council meeting. At that meeting, the city administrator reported to the city council "that there are a few interested developers in the site and that staff will meet with some next week to determine what timelines are available and what plans are intended for the site."

The district court granted the city's motion with respect to Magnolia's statutory-trespass claim but denied the remainder of the city's motion. The district court concluded that the city was not entitled to statutory immunity because its "failure to repair Main Street can be seen as an operational decision," and it also determined, as "a separate basis to conclude that [Magnolia's] claims are not barred by statutory immunity," that

> there is evidence that the January 2015 water line break was caused by the City's use of heavy machinery to repair nearby Budd Avenue in 2014. The use of the heavy machinery to repair the nearby road without care to the surrounding area is a day-to-day operation of government and is not entitled to statutory immunity.

With respect to Magnolia's other claims, the district court concluded that questions of material fact preclude summary judgment. This appeal follows.

## ISSUES

I. Is the city entitled to statutory immunity?

II. Does statutory immunity shield the city from Magnolia's strict-liability claim?

## ANALYSIS

"On appeal from summary judgment, we must review the record to determine whether there is any genuine issue of material fact and whether the district court erred in its application of the law." *Dahlin v. Kroening*, 796 N.W.2d 503, 504 (Minn. 2011).

### I.

■ The city argues that the district court erred by denying its motion for summary judgment because, pursuant to Minn. Stat. § 466.03, subd. 6 (2016), it is entitled to statutory immunity for its discretionary acts. "The application of immunity is a question of law we review de novo." *Vassallo ex rel. Brown v. Majeski*, 842 N.W.2d 456, 462 (Minn. 2014). Generally, a municipality is liable for its torts and the torts of its agents. Minn. Stat. § 466.02 (2016). But a municipality is immune from any tort claim "based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Minn. Stat. § 466.03, subd. 6.

■ A two-step analysis guides us in determining whether a municipality is entitled to statutory immunity. *Christopherson v. City of Albert Lea*, 623 N.W.2d 272, 275 (Minn. App. 2001). First, we must identify the challenged governmental conduct. *Id.* Next, we determine whether the challenged conduct involves planning-level or operational decisions. *Id.* Statutory immunity protects a municipality only for its planning-level decisions, not for its operational decisions. *Conlin v. City of St. Paul*, 605 N.W.2d 396, 400 (Minn. 2000). "Planning level decisions are those involving questions of public policy, that is, the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy." *Id.* Operational decisions involve the "day-to-day operations of

government, the application of scientific and technical skills, or the exercise of professional judgment." *Schroeder v. St. Louis County*, 708 N.W.2d 497, 504 (Minn. 2006).

We begin by identifying the governmental conduct at issue. Magnolia challenges: (1) the city's failure to implement a planned water-main reconstruction project on Main Street adjacent to its building; (2) the city's use of heavy machinery on Budd Avenue in 2014, which it alleges caused the January 2015 water-main leak; and (3) the city's failure to sufficiently respond after the January 2015 water-main leak. The city contends that, because Magnolia's complaint only alleges that the city failed to maintain its water main, the challenged conduct is limited to the city's decision to adopt and implement a maintenance policy on the water main and sewer system under Main Street by Magnolia's building.

Based on our thorough review of the record, we conclude that this matter involves challenges to two distinct governmental acts: (1) the city's decision to adopt a policy to maintain its water main under Main Street by promptly responding to leaks and conducting repairs as soon as possible and (2) the city's use of heavy machinery on Budd Avenue in 2014.

Magnolia characterizes the city's failure to implement its water-main reconstruction plan and its failure to sufficiently respond after the January 2015 water-main leak under Main Street as separate conduct. But the record demonstrates that both relate to the city's maintenance policy.

The city's affidavit establishes that it responded to and repaired the January 2015 water-main leak immediately, in accordance with its maintenance policy. As it relates to the sidewalk adjacent to Magnolia's property, the city similarly stated that its funding to reconstruct the sidewalk was tied to the downtown redevelopment pro-

ject, and it could not afford to otherwise replace the sidewalk. At the time of the water-main leak, there was no defined reconstruction plan that the city had failed to implement. While the city anticipated that the downtown redevelopment project would be completed by December 2014, the grant only required that the project be commenced by December 2015. After the January 2015 leak, the city noted that "there are a few interested developers in the site and that staff will meet with some next week *to determine what timelines are available* and what plans are intended for the site." (Emphasis added.)

Unlike other cases, in which the challenged conduct was the government's failure to implement a policy, Magnolia does not identify any professional or scientific judgment that caused the city's delay to reconstruct the water main; rather, a review of the record demonstrates that the limitations of the need for external funding and the identification of a developer for the entire downtown redevelopment project were the causes for the delay. *Cf. Angell v. Hennepin Cty. Reg'l Rail Auth.*, 578 N.W.2d 343, 346-48 (Minn. 1998) (concluding that statutory immunity did not apply because the failure "to block off the loading dock or to warn of its presence" involved "professional judgments regarding where and how to implement the policy of restricting access" to property, which were operational decisions); *Holmquist v. State*, 425 N.W.2d 230, 232, 234 (Minn. 1988) (distinguishing between an operational decision to post a traffic sign at a particular location, which involved professional judgment, from a policy decision directing if and where traffic signs should be placed).

By contrast, there is nothing in the record that ties the city's work on Budd Avenue to the downtown redevelopment project and the city's maintenance policy, both

of which only concerned Main Street. Because we conclude that there are two instances of challenged governmental conduct, we evaluate both to determine whether the conduct involved operational or planning-level decisions. The city bears the burden of proving it is entitled to statutory immunity. *Conlin*, 605 N.W.2d at 402.

### A.

■ The first instance of challenged governmental conduct is the city's decision to adopt a maintenance policy to "promptly respond to leaks and conduct repairs as soon as possible." Magnolia contends that this conduct was operational because the city failed to implement its reconstruction plan and delayed infrastructure reconstruction of a known hazard despite receiving funding for the reconstruction project. We disagree.

■ "Implementing a policy, in contrast to formulating the policy itself, is often not subject to statutory immunity." *Angell*, 578 N.W.2d at 346. Here, the city's maintenance policy remained in effect even after it received the grant because the funding was tied to the entire downtown redevelopment project. The city could not separately fund the water-main reconstruction under Main Street until it had identified a developer for the entire project.

Magnolia maintains, and the district court concluded, that the city's conduct was operational because it failed to implement its plan to reconstruct the water main once it received adequate funding from a grant. But as we have previously discussed, because no development plan for Main Street was in place at the time of the January 2015 leak, there was no definite reconstruction plan that the city failed to implement. And even if there had been a definite plan, the city's conduct was constrained by economic considerations.

*Holmquist*, 425 N.W.2d at 234 ("Sometimes the implementation of a policy itself requires policymaking.").

Magnolia next asserts that the city's conduct was operational because the city delayed infrastructure repairs of a known hazard. *See Marlow v. City of Columbia Heights*, 284 N.W.2d 389, 391-92 (Minn. 1979) (holding that the failure "to maintain the facility in a safe condition or to warn of hazards" was an " 'operational' failure following the 'planning' decision to operate and maintain the public landing").

In *Marlow*, the supreme court held that statutory immunity did not shield a city from liability for a man's injuries near a public landing in its park. *Id.* The supreme court reasoned that the failure to implement a policy decision was operational conduct. *Id.* It did not conclude, as Magnolia suggests, that the municipality's conduct was operational merely because a hazardous condition existed.

The supreme court has also held that governmental conduct was operational when a municipality failed to mitigate against a known hazard because mitigation was possible and reasonable—not simply because the city failed to mitigate. *Id.* at 392 (stating that the discretionary-acts exception "find[s] greater applicability (and therefore immunity) for decisions made on the executive (planning) level of conduct"); *see Hansen v. City of St. Paul*, 298 Minn. 205, 210, 214 N.W.2d 346, 349 (1974) (finding that the city could not claim statutory immunity in part because it failed to confine or impound a dog that it knew was dangerous when confinement or impoundment was reasonable and would protect the public). In this case, it is undisputed that the city could not reasonably afford to complete its water-main reconstruction project without grant funding. If the city installed the wrong type or size of water-

main lines prior to commencement of the downtown redevelopment project, removal and replacement of those lines would be additional costs that the city could not afford.

■ Magnolia also contends that the city failed to meet its burden to prove that the conduct involved planning-level decisions because the city's only evidence stems from a conclusory, self-serving affidavit from the city administrator, and the city failed to explain why it had not identified a developer. Magnolia is correct that conclusory affidavits or affidavits that "merely identify generalized concerns and seemingly parrot back language from [the supreme court's] case law without incorporating specific facts" do not satisfy a city's burden of proof. *Id.* at 402-03.

In *Conlin*, the City of St. Paul provided an affidavit to support its statutory-immunity defense, in which the city's street maintenance engineer stated that he considered several factors when deciding not to post warning signs after street work, including public-safety concerns, traffic considerations, and financial and social considerations. *Id.* at 399. The only exhibit that accompanied the engineer's affidavit was a four-page, street-maintenance complaint log. *Id.* The supreme court concluded that, without specific facts to support the engineer's financial and social considerations, the affidavit did not satisfy the city's burden to prove that it was entitled to statutory immunity. *Id.* at 403.

But, here, the exhibits accompanying the city administrator's affidavit are consistent with the supreme court's guidance in *Conlin*. The city supported its statutory-immunity argument with several exhibits that demonstrated that it based its maintenance policy on economic factors. The city administrator's affidavit stated that the city's ability to complete its maintenance projects "may be hampered by the avail-

ability of infrastructure-dedicated funding." Attached to the city administrator's affidavit were several exhibits that outlined the city's street and infrastructure maintenance review, the city's reconstruction schedule and costs, a memorandum to the city council discussing possible external funding options for the maintenance projects, and its grant application to fund the downtown redevelopment project. In addition, the city administrator explained that the city could not afford to reconstruct the water main and pavement adjacent to Magnolia's building without grant funding, that it required a developer for the entire project, and that no developer or development plan had been identified at the time of the January 2015 leak. Because the city's affidavit is not conclusory and is supported by specific facts, we conclude that the city satisfied its burden of proof.

Lastly, Magnolia argues that the city provided no substantiating evidence regarding the cost-benefit analysis of postponing the planned repairs after it received the grant. But the city's budget and economic considerations from its 2011 street and infrastructure evaluation were still relevant and included water-main, sidewalk, sewer, and street reconstruction costs. The city could not reasonably fund a separate water-main and sidewalk project on Main Street near Magnolia's building apart from its downtown redevelopment project.

We conclude that the city is entitled to statutory immunity for its conduct related to water-main and infrastructure maintenance under Main Street because it has satisfied its burden of proving that adopting its maintenance policy, which included the decision to "promptly respond to leaks and conduct repairs as soon as possible," involved economic considerations.

## B.

■ The second instance of challenged conduct is the city's use of heavy machinery on Budd Avenue in 2014. The district court stated that "there is evidence that the January 2015 water line break was caused by the City's use of heavy machinery to repair nearby Budd Avenue in 2014," which provided it with a separate basis for its conclusion that the city is not entitled to statutory immunity. Magnolia contends that "jarring from construction" and the use of heavy machinery to repair the sewer infrastructure under Budd Avenue adjacent to its building caused the January 2015 water-main leak[1] and is a separate basis for denying the city's statutory-immunity defense.

■ A municipality is not entitled to statutory immunity for decisions that involve ordinary day-to-day operations because those decisions do not involve an exercise of discretion. *Christopherson*, 623 N.W.2d at 275. Because the use of heavy machinery to repair the sewer line under Budd Avenue was unrelated to the decision-making involved with the redevelopment of Main Street and is fairly characterized as a decision involving day-to-day operations of government, we conclude that the city is not entitled to statutory immunity based on its decision to use heavy machinery for the work done on Budd Avenue near Magnolia's building in 2014.

In summation, we conclude that the city is entitled to statutory immunity for its decision to adopt a policy to maintain its water main under Main Street by prompt-ly responding to leaks and conducting repairs as soon as possible because it satisfied the burden of demonstrating that this was a planning-level decision that involved economic considerations. But because the city's decision to use heavy machinery on Budd Avenue in 2014 was operational in nature, the city is not entitled to statutory immunity for Magnolia's claims arising out of that decision.

## II.

Next, we determine what effect statutory immunity has on Magnolia's strict-liability claim. The city contends that statutory immunity bars strict-liability claims. Whether discretionary-acts immunity, pursuant to Minn. Stat. § 466.03, subd. 6, specifically bars a strict-liability claim is a matter of first impression. The district court did not address this issue because it concluded that the city is not entitled to statutory immunity.

Magnolia cites three cases to argue that Minnesota courts have previously permitted strict-liability claims to proceed against a municipality in circumstances involving breaks in a water main or reservoir. *See Mahowald v. Minn. Gas Co.*, 344 N.W.2d 856 (Minn. 1984); *Quigley v. Village of Hibbing*, 268 Minn. 541, 129 N.W.2d 765 (1964); *Bridgeman-Russell Co. v. City of Duluth*, 158 Minn. 509, 197 N.W. 971 (1924). But each of these cases is inapplicable.

In *Bridgeman-Russell*, destructive quantities of water from a leak in a municipality's water-main pipe flooded and damaged the plaintiff's building and property.

---

1. The facts necessary for us to determine whether the city is entitled to statutory immunity are undisputed, even though the city disputes that it caused the January 2015 water-main leak. Magnolia also contends that it is entitled to the application of res ipsa loquitur on appeal, but we do not reach this issue because material questions of fact remain. *See Olson v. St. Joseph's Hosp.*, 281 N.W.2d 704, 709 (Minn. 1979) ("It is within the province of the jury to find whether or not facts exist that will support the application of the res ipsa loquitur theory.")

158 Minn. at 509-10, 197 N.W. at 972. The case is distinguishable because the defendant did not raise an immunity defense, and it could not argue that statutory immunity applied because the statute had not yet been enacted. *Id.* at 509-12, 197 N.W. at 971-73; *see Steinke*, 525 N.W.2d at 175 (stating that the legislature enacted Minnesota Municipal Tort Liability Act in 1963). *Quigley* addressed whether res ipsa loquitur applied when a leak from a municipality's water main damaged the subbasement of a building. 268 Minn. at 542, 129 N.W.2d at 767. Similar to *Bridgeman-Russell*, the supreme court did not address a statutory-immunity defense because the defendant did not raise it. *Id.* at 541-50, 129 N.W.2d at 767-72. In *Mahowald*, the supreme court held that a gas company was liable for leaks from its natural gas lines located in public streets only if the company was negligent. 344 N.W.2d at 857. Because the defendant was not a municipality, the supreme court did not address a statutory-immunity defense. *Id.* at 857-64.

The city contends that this court has previously held that immunity protects a municipality against a strict-liability claim. *See Hyatt v. Anoka Police Dep't*, 700 N.W.2d 502 (Minn. App. 2005), *review denied* (Minn. Oct. 18, 2005). In *Hyatt*, we concluded that a city was entitled to vicarious official immunity from a strict-liability dog-bite claim for the actions of two of its police officers. *Id.* at 506-09. Because the procedural analysis for claims of statutory immunity and official immunity are similar, we find this argument persuasive. *See Janklow v. Minn. Bd. of Exam'rs for Nursing Home Adm'rs*, 552 N.W.2d 711, 716 (Minn. 1996) ("[I]n both official and statutory immunity, courts must distinguish actions that merit immunity from those that do not.").

Although the parties did not specifically address statutory construction, we conclude that it is essential to resolution of this issue. "The interpretation of a statute is a question of law that we review de novo." *Cocchiarella v. Driggs*, 884 N.W.2d 621, 624 (Minn. 2016).

The object of statutory interpretation "is to ascertain and effectuate the intention of the Legislature." *Id.*; *see* Minn. Stat. § 645.16 (2016). We construe words and phrases "according to rules of grammar and according to their common and approved usage." Minn. Stat. § 645.08(1) (2016). The first step in our statutory-interpretation analysis is to "examine the statutory language to determine whether the words of the law are clear and free from all ambiguity." *Staab v. Diocese of St. Cloud*, 813 N.W.2d 68, 72 (Minn. 2012). A statute is ambiguous if it is "susceptible to more than one reasonable interpretation." *Id.* at 72-73. And if the statute is ambiguous, we may look beyond the statutory language and apply cannons of interpretation to ascertain legislative intent. *Id.* at 73. But if the statute is not ambiguous, we "apply the plain language of the statute." *Cocchiarella*, 884 N.W.2d at 624. We interpret the discretionary-acts exception to tort liability narrowly. *Conlin*, 605 N.W.2d at 400.

"Statutory immunity exists to prevent the courts from conducting an after-the-fact review which second-guesses certain policy-making activities that are legislative or executive in nature." *Watson v. Metro. Transit Comm'n*, 553 N.W.2d 406, 412 (Minn. 1996) (quotation omitted). The relevant language in the Minnesota Municipal Tort Liability Act states: "Subject to the limitations of sections 466.01 to 466.15, every municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether aris-

ing out of a governmental or proprietary function." Minn. Stat. § 466.02; *see Steinke v. City of Andover*, 525 N.W.2d 173, 175 (Minn. 1994). But the act is limited in scope and "does not apply to any claim enumerated in [Minn. Stat. § 466.03]." Minn. Stat. § 466.03, subd. 1 (2016). Minn. Stat. § 466.03, subd. 6, known as the discretionary-acts exception, shields municipalities from tort liability for "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." Because we conclude that the language of the discretionary-acts exception is unambiguous, we apply the plain language of the statute.

The statutory provision that subjects a municipality to liability for its torts does not apply to any exception listed in Minn. Stat. § 466.03, including the discretionary-acts exception. *Id.* Moreover, the discretionary-acts exception states that it shields a municipality from *any tort claim*. Minn. Stat. §§ 466.02, .03, subd. 6. Because the plain language of the statute is absolute and clearly immunizes a municipality from liability for *any* tort claim, we conclude that the discretionary-acts exception shields a municipality from a strict-liability claim. *See Davis v. Hennepin County*, 559 N.W.2d 117, 120 (Minn. App. 1997) ("Statutory immunity is absolute; if it applies to a given set of circumstances it absolutely bars suit and liability notwithstanding the nature of the events underlying a claim."), *review denied* (Minn. May 20, 1997).

Based on a plain reading of the statutory language and our review of caselaw, we conclude that the discretionary-acts exception to municipality liability is absolute and bars all tort claims, including strict-liability claims, when the municipality demonstrates that its conduct involved planning-level decisions.

## DECISION

This matter presents us with two distinct challenges to governmental conduct—the city's decision to adopt a maintenance policy to "promptly respond to leaks and conduct repairs as soon as possible" under Main Street and the city's use of heavy machinery on Budd Avenue in 2014. Because the city satisfied its burden to prove that its maintenance policy was based on economic considerations, we conclude that the city is entitled to statutory immunity with respect to this conduct. Therefore, we reverse the district court's denial of summary judgment with respect to Magnolia's claims arising out of the city's maintenance decisions concerning the infrastructure on Main Street. But we affirm the district court's denial of summary judgment on statutory-immunity grounds with respect to Magnolia's claims arising out of the city's use of heavy machinery on Budd Avenue because that conduct was operational in character. On remand, the district court shall limit Magnolia's claims to those that arise out of the city's use of heavy machinery on Budd Avenue in 2014.

**Affirmed in part, reversed in part, and remanded.**